**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PHARMERICA CORPORATION** | ) | **Case No. 2:16-cv-01481** |
| | ) | |
| **Plaintiff,** | ) | **Judge Cercone** |
| | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LENA STURGEON, ELLIOT** | ) | |
| **GOTTLIEB, ADAM SHIMODA, and** | ) | |
| **CONTINUARX LLC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF PHARMERICA CORPORATION'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff PharMerica Corporation ("PharMerica") submits its Proposed Finding of Fact and Conclusions of Law in advance of the November 3, 2016 preliminary injunction hearing. PharMerica reserves the right to amend and/or supplement its Proposed Finding of Fact and Conclusions of Law in light of the evidence presented at the preliminary injunction hearing, and Orders of this Court.

**FINDINGS OF FACT**

**A.    DEFENDANTS' EMPLOYMENT WITH MILLENNIUM**

1.    PharMerica is a Delaware corporation headquartered in Louisville, Kentucky that provides institutional and hospital pharmacy services throughout the United States.

2.    Millennium Pharmacy Services, Inc. ("Millennium") was a former competitor to PharMerica that was acquired by PharMerica on September 26, 2014 through a purchase of all of Millennium's stock, customer contracts, and employment agreements (the "Stock Purchase.").

3.    Defendant Lena Sturgeon ("Sturgeon") was previously employed by Millennium. As a Millennium employee, Sturgeon was responsible for client retention, managing clinical

teams that oversee the transition of new accounts, managing a team of account managers, managing Millennium's accounts in the Mid-Atlantic Region, overseeing the sales and customer service departments, and assisting with the preparation of the annual budget.  Consequently, Sturgeon has intimate knowledge and familiarity with Millennium's billing practices and customer information, strategies, and had access to documents related to client billing.

4.      On December 10, 2010, Elliot Gottlieb ("Gottlieb") accepted an employment offer from Millennium to work as a Regional Manager Consulting Pharmacist.  In this role, Gottlieb was charged with managing and supervising regional groups of pharmacists in addition to working as a consultant pharmacist that worked directly with Millennium's customers to ensure that drugs were administered properly, ensuring that Millennium's pharmacy services functioned efficiently, and ensuring that PharMerica (and its facilities) were in compliance with regulatory standards.  Thus, Gottlieb was provided and drafted detailed reports and audits relating to Millennium's customers, and was in regular contact with Millennium's customers.

5.      On April 20, 2011, Adam Shimoda ("Shimoda") accepted an employment offer from Millennium to work as a Pharmacy Technician.  In this role, Shimoda had direct contact with PharMerica customers and handled customer complaints and requests via Millennium's online software and via the telephone.  He was also tasked with training and mentoring new technicians, and participating in process improvement initiatives.

6.      On August 19, 2014, Shimoda was promoted to an Assistant General manager.  In this role, Shimoda was responsible for day-to-day operations and workflow of Millennium's Columbia, Maryland pharmacy, as well as the management and supervision of other pharmacists and pharmacy technicians.  Shimoda also was charged with correcting any customer issues or complaints, reviewing and ensuring compliance with the standard operating procedures, and

developed an action plan used to target and serve two specific customers.

7.     Consequently, through their employment with Millennium, Gottlieb, Sturgeon and Shimoda built strong customer relationships with Millennium's customer base, and obtained relevant knowledge and had unique access to Millennium's client lists, pricing information, marketing strategies, business practices, and other confidential and trade secret information.

8.     Their employment responsibilities also greatly facilitated Shimoda's, Gottlieb's and Sturgeon's ability to develop, maintain and deepen their relationships with customers and suppliers of PharMerica, which are also of great value to PharMerica that PharMerica should be provided the opportunity to maintain.

**B.     GOTTLIEB'S AND SHIMODA'S EMPLOYMENT AGREEMENTS WITH MILLENNIUM**

9.     To protect Millennium's confidential and trade secret information, Gottlieb and Shimoda executed certain employment agreements that Millennium used to protect its confidential, proprietary and trade secret information.

10.     As part of Gottlieb's employment with Millennium, he accepted the terms of a written offer (the "Offer") on December 10, 2010.[1]  That written Offer required Gottlieb to not disclose Millennium's confidential or trade secret information (Complaint [Doc. 1], Ex. A, at ¶ 5), to not solicit "any person who is a customer, patient, or supplier" of Millennium (*Id.* at ¶ 6), and to not solicit any of Millennium's employees for a period of one year following his termination of employment (*Id.* at ¶ 7).

11.     On April 20, 2011, Shimoda executed an employment agreement (the "Shimoda

---

[1] Paragraph 10 of the Millennium Offer provides that it will be governed by Pennsylvania law.

Millennium Employment Agreement")[2] as part of his employment with Millennium.   Paragraph

5 of that agreement provides:

> As a condition of your employment you agree that . . . you will not at any time, in any form or manner, either directly or indirectly, disclose or communicate to any person, corporation, or organization not otherwise entitled to receive such information in our best interest any information concerning our business, or that of affiliates, including without limitation, the names of our patients or employees, the fees we obtain or have obtained for our services, financial information, computer or software programs, marketing plans, pricing information, the existence of any discussions or facts relating thereto, our manner of operation or our plans, processes, or data of any kind.

(Complaint [Doc. 1], Ex. B, at ¶ 5).

12.     Shimoda further agreed, through execution of the Millennium Employment

Agreement, to "not solicit or otherwise seek to induce (directly or indirectly) any person who  is

a customer, patient, or supplier of us or any of our affiliates to terminate his, her or its

relationship with us or any of our affiliates" and "for a period of one year after leaving our

employ for any reason, you will not directly or indirectly encourage, recruit, or solicit . . . any of

our employees, or those of our affiliates, to leave our collective employer or to join you at your

new employer . . . ." (*Id.* at ¶ 6-7).

13.     On April 22 and January 2, 2011, Shimoda and Gottlieb respectively executed a

Confidentiality Agreement with Millennium.  This Agreement provides: "As an employee [of

Millennium], I will not, at any time, disclose or use, either during or subsequent to my

employment, any information, knowledge or confidential material relating to the operation of

[Millennium] or its facilities and their residents."  (Complaint [Doc. 1], Exs. C and D).

14.     On April 1, 2013, Gottlieb further agreed to a Confidentiality, Copyright and

other Intellectual Property Assignment and Restrictive Covenant Agreement with Millennium,

---

[2] Paragraph 10 of the Millennium Employment Agreement provides that it will be governed by Pennsylvania law.

Paragraph 3(c) of the Agreement provides in relevant part that "Employee agrees that during the term of Employee's relationship with the Company and thereafter, Employee will not, directly or indirectly, in any capacity, use or disclose, or cause to be used or disclosed, any Confidential Information," as that term is further defined therein.  (Complaint [Doc. 1], Ex. E, at ¶ 3(c)).

15.     Gottlieb further agreed that both during his employment and for a period of twelve months thereafter, he would not:

> (i)  Participate or engage in, or provide assistance to any person that engages in, directly or indirectly, the business of creating or distributing any Competing Product (as defined below) for purchase, lease, license, or use anywhere in the Restricted Area (as defined below); or . . .
>
> (iii)  Solicit any Customer of Company with whom Employee has had or will have had significant and repeated communication at any time during the preceding 12-month period . . . ; or
>
> (iv)  Solicit, hire, recruit, employ, or retain any person or entity who is employed by or has a contractual or consulting relationship with Company, or induce or encourage any person or entity who is employed by or has a contract or consulting relationship with Company to terminate such employment, contractual, or consulting relationship . . . .; or
>
> (v)  Use Confidential Information as defined above to assist in the provision of computer software design, development, code writing, or programming services, devising sales, marketing, or cost containment strategies, or the solicitation of customers, employees, or contracts of the Company . . . .

(*Id.* at ¶ 5(b)).

16.     On June 5, 2013, Gottlieb further agreed to the terms of a Protection of Interest and Non-Disclosure Agreement with Millennium.  Under that Agreement, Gottlieb agreed to "not, directly or indirectly, use , disseminate, disclose, divulge, communicate, lecture upon, or publish articles containing any Confidential Information (including but not limited to that described above) either during or after your employment by Millennium."  (Complaint [Doc. 1], Ex. F).

17.     Gottlieb further agreed that "for so long as you are employed by Millennium and for twelve (12) months thereafter, you will not directly or indirectly, on behalf of yourself or any other individual or entity:

> (i) employ, solicit, recruit, contract with, induce, influence or advise, or directly or indirectly cause the employment, solicitation or recruitment of customers, employees, consultants, agents or referral source of any Millennium entity, for the purpose of engaging in a business substantially similar to the business of, or competitive with any Millennium entity . . . .

> (iv) engage in business for Yourself, or on behalf of or in association with any other person or entity that is in the business of providing institutional pharmacy services, pharmacy operations, and/or electronic pharmaceutical or prescription ordering technology to any person or entity or contemplating doing business in the long term care industry, including but not limited to, skilled nursing facilities assisted living facilities and/or continues care retirement communities in direct or indirect competition with the products, services or technology, as are engaged by the Company.

(*Id.* at ¶ 3(a)).

## C.     MILLENNIUM IS ACQUIRED BY PHARMERICA

18.     On September 26, 2014, PharMerica acquired all of Millennium's outstanding stock, customer contracts, and employment agreements in the Stock Purchase.

19.     As part of the Stock Purchase, Sturgeon received a cash payout of at least $69,750.00 as a management closing bonus.  PharMerica further paid the shareholders of Millennium $13,247.118.10 in addition to PharMerica paying off millions of dollars in debt owed by Millennium.

20.     Following the Stock Purchase, Sturgeon, Shimoda, and Gottlieb continued as employees of PharMerica in the same roles they had previously held with Millennium and therefore continued to have access to PharMerica's propriety software systems, client lists, pricing information, marketing strategies, business practices, and other confidential and trade secret information.

21.     For example, Gottlieb continued to provide detailed clinical expertise by responding to medication-related questions and concerns initiated by PharMerica customers.  He also worked directly with PharMerica's customers to review facility practices to ensure compliance with State and Federal regulations and standards for the specific long-term care or other practice setting, and drafted monthly audit reporting for PharMerica's customers.  Gottlieb further provided on-site training and education on a variety of medication-related topics directly to PharMerica customers.

22.     Sturgeon, however, was provided additional responsibilities with PharMerica (in addition to those that she had while employed by Millennium) and was responsible for assisting with the integration of Millennium into the PharMerica operating system, which included client retention, managing clinical teams that oversee the transition of new accounts, managing a team of account managers, integrating Millennium's proprietary MPSRx eMAR system, managing PharMerica's accounts in the Mid-Atlantic Region acquired from Millennium, and received information relating to customer sales and customer service.

23.     Therefore, Sturgeon, Gottlieb and Shimoda developed strong customer relationships and had direct knowledge of PharMerica's billing practices and could access documents related to client billing, and also had direct knowledge of PharMerica's customer and operational issues, particularly during the post-acquisition of Millennium.

24.     In addition, Sturgeon, Shimoda, and/or Gottlieb had access to and used PharMerica's confidential and proprietary pricing strategies, cost and margin information, transportation costs, bidding history, inventory, marketing strategies, technology plans, weaknesses, and future growth opportunities as part of their employment with Millennium and then again with PharMerica.

25.     This information is not available to PharMerica's competitors.

**D.      GOTTLIEB AND SHIMODA'S CONTRACTUAL OBLIGATIONS TO PHARMERICA.**

26.     PharMerica takes reasonable steps to protect its proprietary, confidential, and trade secret information including restricting access to its facilities, providing a secure company laptop to its employees that requires a username and password to access PharMerica's electronic information, segregating electronic information and providing access to information on a need to know basis only, and utilizing non-competition, non-solicit, and confidentiality agreements with its employees to further protect its information.

27.     For example, following the Stock Purchase Gottlieb and Shimoda agreed to the terms of a Nondisclosure and Non-Solicitation Agreement with PharMerica (the "PharMerica Employment Agreements").

28.     The PharMerica Employment Agreements were designed in part to protect PharMerica's legitimate business interests including its confidential and trade secret information, which the Agreements defined as:

> PharMerica has valuable confidential business information, including, but not limit PharMerica 's Customer Relationships, operating methodologies, assets, marketing strategies, information relevant to the Company's operations, business and marketing plans; financial information, and performance, financial and reimbursement policies and information; technical data, research and development; clinical tools, programs, processes and protocols; information concerning employees, consultants, contractors, and prospective employees; the identity of existing and potential contracts, customers, vendors, suppliers, and business opportunities; confidential and proprietary materials, records and documents; and information, procedures, systems and techniques used by the Company in evaluating its operations and the quality of its financial and clinical performance, which PharMerica has acquired or received from other parties, including Employee, in confidence ("PharMerica's Confidential Information");

> PharMerica has trade secrets, including, but not limited to, programs, devices, methods, techniques, and processes, that derive independent economic value from

not being generally known and that are the subject of reasonable efforts to maintain their secrecy ("PharMerica's Trade Secrets").

(Complaint [Doc. 1], Exs. G and H, Recitals, p. 1).

29.     Under the terms of the PharMerica Employment Agreements, Gottlieb and Shimoda agreed to not "divulge, reveal or communicate PharMerica's Confidential Information or Trade Secrets to any person, firm, corporation or entity whatsoever, or use PharMerica's Confidential Information or Trade Secrets for Employee's own benefit or for the benefit of others."  (*Id* at ¶ 2(a)).

30.     Gottlieb and Shimoda further agreed, upon termination, to "deliver to PharMerica all materials and property of PharMerica in Employee's possession, including, but not limited to PharMerica's Confidential Information and Trade Secrets."  (*Id.* at ¶ 2(a)).

31.     Gottlieb and Shimoda further agreed that, both during their employment and for a period of twelve months following the termination of their employment with PharMerica, to not "directly or indirectly, divert business from PharMerica or solicit, accept or procure business from . . . any customer of PharMerica," "interfere, in any manner, with PharMerica's Customer Relationships," or "directly or indirectly, solicit for employment, employ or otherwise engage the services of for himself or on behalf of any other person or entity, any individual who was employed by PharMerica at the time of Employee's voluntary or involuntary separation from PharMerica."  (*Id* at ¶ 2(b)-(c)).

32.     On December 11 and 15, 2014, Gottlieb and Shimoda respectively also agreed to a Conflict of Interest Statement with PharMerica.  This agreement provides that they would not engage in "the unauthorized use or disclosure of corporate trade secrets, confidential information or proprietary information" or "conduct that is disloyal, disruptive, competitive or damaging to [PharMerica] . . . ."  (Complaint [Doc. 1], Exs. I and J).

33.     Gottlieb and Shimoda respectively further agreed to a Confidentiality Agreement.[3]  This agreement with PharMerica which provides that:

> While in the employ of PharMerica and after any termination of employment, regardless of the reasons for the termination, Employee . . . agrees that he/she shall not use, disseminate, disclose, or publish, directly or indirectly,  . . . all proprietary information concerning the Company's operating methodologies and clinical protocols, referral sources, assets, marketing strategies, financial and clinical matters, including all procedures, systems and techniques used by the Company in evaluating its operations and the quality of its financial and clinical performance, all financial and clinical software, data and pricing information relevant to the Company's operations and all business and marketing plans and financial projections."

(Complaint [Doc. 1], Exs. K and L).

34.     Sturgeon, Shimoda, and Gottlieb were also subject to the PharMerica Employee Handbook (the "Handbook").   The Handbook required Sturgeon, Shimoda, and Gottlieb to protect PharMerica's confidential information:

> I am aware that during the course of my employment with PharMerica confidential information will be made available to me, including but not limited to product designs, marketing strategies, business plans, financial data, drug formularies, client lists or contract information, information about clients that allows PharMerica to service them better, pricing policies and other related information. I understand that this information is proprietary and critical to the success of PharMerica and must not be given out or used  outside of PharMerica premises or with noncompany employees. In the event of separation of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with, or for the benefit of, any other individual or company.

(Complaint [Doc. 1], Ex. M, at p. 58).

35.     The Handbook further provides that  "your employment with PharMerica assumes an obligation to maintain confidentiality of client, personnel, financial and operational information" and Sturgeon, Shimoda, and Gottlieb were further prohibited from "[u]sing confidential or PharMerica proprietary information for personal gain or the benefit of others."

---

[3] Paragraph 5 of the Confidentiality Agreement provides that it is governed by Kentucky law.

(*Id.* at pp. 50-51).

36.     On December 8, 2014, Shimoda executed a Receipt and Acknowledgement of the Handbook.  On December 9, 2014, Gottlieb executed a Receipt and Acknowledgement of the Handbook. (Complaint [Doc. 1], Exs. N and O).

37.     Sturgeon, Shimoda, and Gottlieb were also subject to the PharMerica Corporation Code of Business Conduct and Ethics.  This Code required all PharMerica employees to "hold in strictest confidence and shall not, directly or indirectly, in any manner, disclose to any person or entity, for use for the benefit of himself/herself or others, any information deemed confidential by the Company . . . . No one shall use knowledge of the Company's confidential dealings, learned through his/her association with the company, for personal gain or advantage, nor shall anyone disclose such information to enable others to profit from it. . . . If your employment . . . with the Company ends for any reason, you are still bound to protect the confidentiality of information you obtained while you were a Company associate."  (Complaint [Doc. 1], Ex. P). On December 11 and 15, 2014, Gottlieb and Shimoda respectively executed the Acknowledgement of Receipt and Understanding of the Code of Ethics and Business Conduct. (*Id.* at Exs. Q and R).

**E.     <u>GOTTLIEB AND SHIMODA RESIGN FROM PHARMERICA TO JOIN CONTINUARX, A COMPETING PHARMACY OPERATED BY STURGEON, IN BREACH OF THEIR EMPLOYMENT AGREEMENTS</u>**

38.     The pharmacy services industry in general is highly competitive, especially within the institutional and hospital services segment.  As a result, pharmacy services companies like PharMerica compete aggressively for many of the same customers as its competitors.  Customer relationships, management, service, training, and pricing are critical to maintaining market share and viability.

39.     Defendant ContinuaRX LLC ("ContinuaRX") is a long term care pharmacy organized in Delaware, and conducting or planning to conduct business in states including Pennsylvania, Maryland, Virginia, as well as Washington, D.C.  It intends to compete against PharMerica for the same customers, and is staffed by mostly former PharMerica employees. ContinuaRX anticipates that it will be fully operational in early 2017.

40.     Sturgeon resigned from PharMerica on May 15, 2015.  Sturgeon intends to manage and operate ContinuaRX in order to directly compete with PharMerica and is systematically targeting PharMerica's customers and employees to assist with the operations of ContinuaRX.   In fact, Sturgeon has already successfully employed a number of former PharMerica employees in addition to Gottlieb and Shimoda.

41.     Gottlieb was first contacted by Sturgeon to join ContinuaRX as a consultant pharmacist in June or July, 2016.  Gottlieb resigned from PharMerica on August 4, 2016 to join ContinuaRX as a consultant pharmacist on September 12, 2016, and will be performing the same duties on behalf of ContinuaRX that he did for PharMerica/Millennium.

42.     The customer relationships Gottlieb developed as a consultant pharmacist for Millennium and PharMerica is integral to obtaining customer contracts on behalf of ContinuaRX and diverting business from PharMerica to ContinuaRX.

43.     Gottlieb's actions in the days before his resignation and while still employed by PharMerica evidence this fact.  Gottlieb sent numerous PharMerica documents to his personal email address, and maintains further PharMerica documents within the sent box of his personal email account. (Complaint [Doc. 1], Exs. X, W, Y).   A forensic analysis  of Gottlieb's work computer further revealed that in the days leading up to his resignation, Gottlieb was further accessing and viewing PharMerica forms and policies that could only be used to start a

competing pharmacy services company.

44.     On August 3, 2016, the day before his resignation, a forensic analysis of his work computer revealed that Gottlieb plugged a SanDisk Prod Cruzer Glide (s/n 4C530001040717103242&0) into his work computer that also contained confidential PharMerica customer information.  Although Gottlieb was required to immediately return his work computer and portable electronic devices (included the SanDisk USB Device) upon his resignation, he did not return PharMerica's electronic equipment until August 16, 2016 – 12 days after his resignation.

45.     Gottlieb further emailed numerous PharMerica documents to himself which contain PharMerica proprietary customer information in the days immediately preceding his employment with ContinuaRX.  Gottlieb also admits that he has a panoply of PharMerica trade secret and confidential documents on his personal computer to this day, and that he was not provided permission to take these documents or place them on the hard drive of his personal computer.  Gottlieb is currently using his personal computer, which contains the PharMerica documents, to conduct his business on behalf of ContinuaRX.

46.     Gottlieb has further solicited PharMerica customers.  For example, on August 1, 2016, Gottlieb exchanged emails with a current PharMerica customer, and provided his personal contact information and stated that "if you have any questions about anything regarding my consulting at any of the homes, please feel free to contact me."  (Complaint [Doc. 1], Ex. U).

47.     On August 3, 2016, Gottlieb contacted another customer of PharMerica and stated that he would be joining "a new pharmacy that will be starting up in the next couple months." (*Id.* at Ex. V).

48.     Following his resignation from PharMerica, Gottlieb continues to remain in close

contact with select PharMerica employees.

49.     Shimoda, like Gottlieb, was also solicited by Sturgeon in early July, 2016 to join ContinuaRX as a managing pharmacist.  On July 29, 2016, Shimoda resigned from PharMerica to join ContinuaRx, and will perform the same managerial responsibilities and job functions as he did with Millennium and PharMerica, including ensuring customer satisfaction requiring day to day interaction with customers.  The customer relationships Shimoda developed as a managing pharmacist for Millennium and PharMerica is integral to obtaining customer contracts on behalf of ContinuaRX and diverting business from PharMerica to ContinuaRX.  Thus, if ContinuaRX successfully solicits PharMerica's customers as it intends to do, Shimoda will necessarily contribute to the interference with those customers.

## CONCLUSIONS OF LAW

### A.     JURISDICTION AND VENUE.

1.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the dispute is between citizens of different states and the amount in controversy exceeds $75,000.

2.     Subject matter jurisdiction is further proper in this court pursuant to 28 U.S.C. § 1331 as this action also arises under 18 U.S.C. § 1832(c), the Defend Trade Secrets Act of 2016, which  provides United States District Courts with original jurisdiction of civil actions brought under this section.

3.     Personal Jurisdiction and venue are proper in the United States District Court for the Western District of Pennsylvania because PharMerica has suffered, and will continue to suffer, irreparable harm in Pennsylvania through the loss of its current and prospective customers and employees targeted by Defendants and located in Pennsylvania, and Defendants are

benefitting from, or will benefit from, the threatened disclosure of PharMerica's confidential and trade secret information to cause harm to PharMerica in Pennsylvania.  Sturgeon is also a resident living in the Western District of Pennsylvania, and ContinuaRX has admitted to its intent to conducting business in Pennsylvania and targeting PharMerica's customers.  Moreover, Shimoda and Gottlieb executed multiple employment agreements governed by Pennsylvania law, and as ContinuaRX employees, intend to serve customers located in Pennsylvania. Gottlieb and Shimoda have further cooperated and exchanged communications with Sturgeon who is located in Pennsylvania regarding their employment with ContinuaRX.

4.     Contractual choice of law provisions are generally given effect. *See, e.g., Smith v. Commonwealth Nat'l Bank,* 557 A.2d 775, 777 (Pa. Super. 1989).  Although the employment agreements contain choice of law provisions in Pennsylvania, Illinois, and Kentucky, each state recognizes restrictive covenant, and the analysis of their validity and enforcement is the same.

## B.     PRELIMINARY INJUNCTION STANDARD.

5.     PharMerica's request for preliminary injunctive relief, made pursuant to Federal Rule of Civil Procedure 65(a), is governed by federal law.  *Armstrong World Indus., Inc. v. Allibert*, No. 97-3914, at *40 (E.D. Pa. Nov. 26, 1997).

6.     PharMerica is entitled to a preliminary injunction because the facts establish (1) that it has a reasonable probability of success on the merits; (2) that irreparable harm will result if the relief sought is not granted; (3) that granting preliminary relief will not result in even greater harm to the Defendants; and (4) that preliminary relief is in the public interest. *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002).

## C.     PHARMERICA IS LIKELY TO SUCCEED ON THE MERITS OF THIS CASE

7.     PharMerica is likely to succeed on the merits of its claims because the facts

establish that (1) Gottlieb and Shimoda breached the confidentiality provisions of their employment agreements; (2)  Gottlieb and Shimoda breached the non-competition provision of their employment agreements; (3) Gottlieb and Shimoda breached the non-solicitation provision of their employment agreements;  (4) Defendants misappropriated, or inevitably will disclose, PharMerica's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act and Pennsylvania common law; (5) Defendants misappropriated, or inevitably will disclose, PharMerica's trade secrets in violation of the Defend Trade Secrets Act; (6) Defendants tortuously interfered with PharMerica's contractual and business relationships; and (7) Defendants engaged in unfair competition.

### *Gottlieb's and Shimoda's Employment Agreements are Enforceable*

8.      As an initial matter, the Court finds that Shimoda and Gottlieb remained subject to their employment agreements executed with Millennium described above following the Stock Purchase.  *See Zambelli Firewords Mfg. Co. v. Wood,* 592 F.3d 412, 422-23 (3d Cir. 2010) (finding the transfer of stock to have no effect on the ability of  a corporate entity to enforce a non-compete agreement);  *J.C. Ehrlich Co. v. Martin*, 979 A.2d 862, 866 (Pa. Super. Ct. 2009) (enforcing a non-compete agreement where the employer consolidated with another corporation through a stock purchase agreement and did not change names); *Siemens Med. Solutions Health Servs. Corp v. Carmelengo*, 167 F. Supp. 2d 752, 756-60 (E.D. Pa. 2001) (enforcing a non-compete agreement between an employee and the purchaser of the employer's stock);  *Missett v. Hub Int'l Pa., LLC,*  6 A.3d 530, 534-538 (Pa. Super. Ct. 2010) (finding the sale of membership interest in an LLC to be akin to the sale of stock and enforcing a non-compete agreement, even when the LLC changed names).

9.      Moreover, the Court finds that the integration clause contained in the PharMerica

Employment Agreement does not displace Gottlieb's 12-month non-competition agreement with Millennium.  While both Shimoda's and Gottlieb's Millennium and PharMerica Employment Agreements contain similar non-disclosure and non-solicit provisions, Gottlieb's PharMerica Employment Agreement does not contain a true non-competition provision similar to that contained in his Millennium Employment Agreements. Thus, these non-compete provisions in the Millennium contracts are valid and enforceable because they were not integrated into the PharMerica Employment Agreement, as they cover different subject matter.  *See Solar Innovations v. Plevyak*, No. 1110 MDA 2012, 2013 Pa. Super. Unpub. LEXIS 1230, at *18-19 (Sup. Ct. pa. March 20, 2013).

10.     The Court further finds that Gottlieb's and Shimoda's employment agreements are valid, enforceable contracts supported by adequate consideration, and were not executed under duress.  Additionally, the restrictive covenants may be enforced because they are (1) incident to an employment relationship, (2) reasonably necessary to protect the employer's interests, and (3) reasonably limited scope.  *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007). The agreements that Shimoda and Gottlieb executed with Millennium and PharMerica are necessary, reasonable, and narrowly tailored to ensure the protection of PharMerica's trade secret and confidential information (including the trade secret and confidential information that PharMerica acquired from Millennium), customer relationships, and the significant investment required to train and educate its employees.

11.     PharMerica has performed its obligations and satisfied all conditions precedent to the PharMerica Employment Agreements.

### *Breach of Confidentiality Provisions of Employment Agreements (Count I)*

12.     PharMerica is likely to succeed on the merits of this claim because Gottlieb and

Shimoda, by accepting employment with ContinuaRX, breached the confidentiality provisions of their employment agreements, which required Gottlieb and Shimoda to maintain the confidentiality of PharMerica's confidential information and trade secrets, as those terms are defined therein and by common law. *See National Bus. Servs. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (recognizing that a non-disclosure provisions in employment agreements are enforceable against the employee).

13.     Gottlieb's and Shimoda's current employment with a directly competing pharmacy breaches this agreement, as it will inevitably result in the disclosure of PharMerica's confidential information and trade secrets.

14.     Gottlieb is in further breach of his employment agreements because he sent PharMerica's confidential information and trade secrets to and from his personal email address in the days leading up to his resignation, and in the days immediately preceding his employment with ContinuaRX.

15.     Accordingly, preliminary injunctive relief is necessary to prevent further inevitable breaches of the confidentiality provisions of Gottlieb's and Shimoda's employment agreements pending trial.

### *Breach of Non-Competition/Non-Interferences Provisions of Employment Agreements (Count II)*

16.     PharMerica is likely to succeed on the merits of this claim because Gottlieb and Shimoda intentionally and knowingly breached the non-interference provisions in their respective PharMerica employment agreements. *See Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 211 (Pa. 1976) (recognizing that a covenant not to compete to enforceable).

17.     Gottlieb and Shimoda agreed they would not, both during their employment with

PharMerica and for a period of 12 months following their resignation from PharMerica, "directly or indirectly, divert business from PharMerica or solicit, accept, or procure business from . . . any customer of PharMerica," "interfere, in any manner, with PharMerica's Customer Relationships." (Complaint [Doc. 1], Exs. G and H, at ¶¶ 2(b)-(c)).

18.     By accepting employment with a direct competitor that intends to target and service current, former, and prospective PharMerica customers, Gottlieb and Shimoda will directly or indirectly interfere with PharMerica's customer relationships in violation of their PharMerica employment agreements.

19.     Gottlieb and Shimoda will further divert business from PharMerica to ContinuaRX in light of the finite world of customers in the industry.

20.     Accordingly, preliminary injunctive relief is necessary to prevent further inevitable breaches of the non-interference provisions of Gottlieb's and Shimoda's PharMerica employment agreements pending trial.

21.     Gottlieb further agreed to a Confidentiality, Copyright and Other Intellectual Property Assignment and Restrictive Covenant Agreement with Millennium which provides that both during his employment and for a period of twelve months thereafter, he would not:

> (i)  Participate or engage in, or provide assistance to any person that engages in, directly or indirectly, the business of creating or distributing any Competing Product (as defined below) for purchase, lease, license, or use anywhere in the Restricted Area (as defined below); or . . .

(Complaint [Doc. 1], Ex. E, at ¶ 5(b)).

22.     Gottlieb further agreed, by executing the Protection of Interest and Non-Disclosure Agreement with Millennium, that "for so long as you are employed by Millennium and for twelve (12) months thereafter, you will not directly or indirectly, on behalf of yourself or any other individual or entity:

> (i) employ, solicit, recruit, contract with, induce, influence or advise, or directly or indirectly cause the employment, solicitation or recruitment of customers, employees, consultants, agents or referral source of any Millennium entity, for the purpose of engaging in a business substantially similar to the business of, or competitive with any Millennium entity . . . .
>
> (iv) engage in business for Yourself, or on behalf of or in association with any other person or entity that is in the business of providing institutional pharmacy services, pharmacy operations, and/or electronic pharmaceutical or prescription ordering technology to any person or entity or contemplating doing business in the long term care industry, including but not limited to, skilled nursing facilities assisted living facilities and/or continues care retirement communities in direct or indirect competition with the products, services or technology, as are engaged by the Company.

(*Id.* at ¶ 3(a)).

23.     By accepting employment with a direct competitor that intends to compete for the same customers in the same geographic region, Gottlieb is in direct violation of the non-competition provisions of the enforceable Millennium employment agreements.

24.     Accordingly, preliminary injunctive relief is necessary to prevent further inevitable breaches of the non-competition provisions of Gottlieb's Millennium employment agreements pending trial.

### Breach of Non-Solicitation Provisions of Employment Agreements (Count III)

25.     PharMerica is likely to succeed on the merits of this claim because Gottlieb and Shimoda intentionally and knowingly breached the non-solicitation provisions of their respective employment agreements. *See Plate Fabrication & Machining, Inc. v. Beiler*, No. 05-2276, 2006

U.S. Dist. LEXIS 52, at *18-21 (E.D. Pa. Jan. 3, 2006) (recognizing the enforceability of non-solicitation provisions in employment agreements).

26.     Gottlieb and Shimoda agreed that they would not, both during their employment with PharMerica and for a period of 12 months following their resignation from PharMerica, "directly or indirectly, divert business from PharMerica or solicit, accept or procure business from . . . any customer of PharMerica," or "directly or indirectly, solicit for employment, employ or otherwise engage the services of for himself or on behalf of any other person or entity, any individual who was employed by PharMerica at the time of Employee's voluntary or involuntary separation from PharMerica."  (Complaint [Doc. 1], Exs. G and H, at ¶¶ 2(b)-(c)).

27.     Gottlieb and Shimoda have breached the non-solicitation provisions of their employment agreements described above through their current and/or threatened employment with a competing pharmacy that will inevitably result in the direct or indirect solicitation of PharMerica's customers or diversion of business from PharMerica.

28.     Gottlieb has further directly solicited PharMerica customers in the days leading up to his resignation, and continues to remain in contact with certain PharMerica customers even after his resignation from employment. (*Id.* at Exs. U & V).

29.     Gottlieb has also remained in close contact with several PharMerica employees since his resignation from PharMerica, and it is likely that he will solicit, or assist with the solicitation of, these employees on behalf of ContinuaRX once ContinuaRX is fully operational.

30.     Thus, Gottlieb is in further breach of his PharMerica Employment Agreement by soliciting PharMerica employees and customers, and attempting to divert PharMerica's customers to a new competing pharmacy prior to expiration of the non-solicitation period.

31.     Accordingly, preliminary injunctive relief is necessary to prevent further

inevitable breaches of the non-solicitation provisions of Gottlieb's and Shimoda's PharMerica employment agreements pending trial.

### Threatened Misappropriation of Trade Secrets (Count IV & V)

32.     PharMerica will likely succeed on the merits of this claim because Gottlieb and Shimoda, who intend to go work for a direct competitor of PharMerica, possess PharMerica's highly confidential and valuable information, including proprietary business information relating to PharMerica's business operations, and had access to trade secrets and other confidential information protected by the Pennsylvania Uniform Trade Secret Act ("PUTSA") and Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*, which creates an imminent and threatened misappropriation through use or disclosure in the course of their employment with ContinuaRX.

33.     Gottlieb and Shimoda possess valuable trade secrets and confidential and proprietary business information relating to PharMerica's business and operations, and were provided access to trade secret and confidential information that is protected by the PUTSA and Defend Trade Secrets Act while working for Millennium and then PharMerica, including, but not limited to, PharMerica's service methods, processes, capabilities, strengths and weaknesses, market opportunities, marketing strategies, prospective and current customers, customer preferences, customer needs, cost and pricing information, and business strategies, among other confidential, proprietary and trade secret information defined in the PharMerica Employment Agreements. *See, e.g.*, *Thermo-Guard Inc. v. Cochran*, 408 Pa. Super. 54, 596 A.2d 188, 193-94 (Pa. Super. Ct. 1991) (recognizing that trade secrets, customer goodwill, and specialized training and skills acquired by an employer are legitimate business interests); *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 623-25, 136 A.2d 838, 842-43 (Pa. 1957) (recognizing that customer lists and information are confidential and entitled to protection).

34.     PharMerica has spent significant time and money developing its trade secrets and takes reasonable measures under the circumstances to maintain the confidentiality of its trade secrets.

35.     PharMerica derives economic value from trade secrets described herein because they are not generally known to, and not readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use.

36.     PharMerica's trade secrets are subject to an imminent and threatened misappropriation (by use, if not also disclosure) in this case because Gottlieb and Shimoda intend to work for a direct competitor in a specialized market offering similar services.  By accepting employment with ContinuaRX, Gottlieb and Shimoda have created an imminent threat that Gottlieb and Shimoda – while performing duties for Sturgeon's competing pharmacy – will disclose or use PharMerica's trade secrets. *See Air Products & Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1124-25 (Pa.Super. 1982) (affirming lower court's decision that ex-employee could not go to work for competitor without drawing from former employer's confidential information).

37.     Gottlieb has further misappropriated PharMerica's trade secrets by sending customer information to and from his personal email address in the days leading up to his resignation from PharMerica that have not been returned to PharMerica, and on the days immediately before he intended to begin work for ContinuaRX, and he admits that trade secret customer information belonging to PharMerica remains on the hard drive of his personal computer which Gottlieb uses in performing his work on behalf of ContinuaRX.

38.     Sturgeon and ContinuaRX have not taken any efforts to ensure that PharMerica's trade secret information is not disclosed. To the contrary, Sturgeon and/or ContinuaRX intends to employ Gottlieb and Shimoda in a substantially similar role to the one they held with PharMerica because of the trade secret information in which they were privy to while employed by Millennium and PharMerica.

39.     Accordingly, preliminary injunctive relief is necessary to prevent further threats of the misappropriation of PharMerica's trade secret information.

### Tortious Interference with Contractual and Business Relations (Count VI)

40.     PharMerica is likely to succeed on the merits of this claim because Sturgeon and ContinuaRX interfered with Gottlieb's and Shimoda's employment agreements with PharMerica, causing or inevitably causing Gottlieb and Shimoda to use or disclose confidential information. *See CGB Occupational Therapy v. RHA Health Services*, 357 F.3d 375, 388 (3d Cir. 2004) (noting that the systematic inducement an employee to leave his present employment is actionable in Pennsylvania "when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away its customers . . . .").

41.     Gottlieb and Shimoda agreed to the terms of the PharMerica and Millennium employment agreements described above.

42.     Sturgeon and/or ContinuaRX have knowledge of Gottlieb's and Shimoda's non-competition, non-solicitation, and non-disclosure agreements with PharMerica.

43.     Sturgeon and/or ContinuaRX purposely caused, or inevitably will cause, Gottlieb and Shimoda to disclose PharMerica's confidential and/or trade secret information, to solicit PharMerica's customers and employees, to unfairly compete against PharMerica, and to divert

PharMerica's business in violation of their employment agreements.

44.     Defendants will use the confidential and/or trade secret information belonging to PharMerica to further interfere with PharMerica's business relationships and agreements with its current, former, and prospective customers.

45.     Defendants' actions are not privileged and will likely cause financial harm to PharMerica. To the contrary, Gottlieb and Shimoda are contractually prohibited from interfering with PharMerica's business and contractual relationships with its customers and employees.

46.     Accordingly, preliminary injunctive relief is necessary to prevent further tortious interference with PharMerica's employee and customer relationships.

### Unfair Competition (Count VII)

47.     PharMerica will likely succeed on the merits of its unfair competition claim because Defendants engaged in conduct that is "contrary to honest, industrial and commercial practice" by tortiously interfering with PharMerica's contracts and business relationships and misappropriating its confidential information and trade secrets in order to  unlawfully and unfairly compete against PharMerica.  *See Lakeview Ambulance and Medical Services, Inc.*, No. 94-2166, 1995 Pa. Dist. & Cnty. Dec. LEXIS 279, at *3-4 (Pa. C.P. Oct. 18, 1995) (citing *International Society for Krishna Consciousness, Inc. v. Stadium Authority of Pittsburgh*, 479 F. Supp. 792 (W.D. Pa. 1979)).

48.     In addition, Sturgeon and/or ContinuaRX are intentionally soliciting and raiding PharMerica's employees in order to staff her competing pharmacy services company with employees that have useful customer relationships, training and experience, and confidential/trade secret information belonging to PharMerica.

49.     Sturgeon and/or ContinuaRX are aware that certain employees are under contract

with PharMerica and possess confidential and/or trade secret information belonging to PharMerica, but are intentionally inducing the resignation of key PharMerica employees in order to gain access to PharMerica's trade secrets and other confidential information, and to start her own competing pharmacy services company.

50.     The foregoing conduct of Defendants constitutes an unfair method of competition intended to destroy, and/or having the effect of destroying, PharMerica's competitive advantages, its business organization, its operational capacity to service their clients, its goodwill and business opportunities, and its expectancy and standing

51.     Accordingly, preliminary injunctive relief is necessary to prevent further unfair competition.

**D.     <u>PHARMERICA WILL SUFFER IRREPARABLE HARM</u>**

52.     Based on the nature of Defendants' wrongful actions, PharMerica has and is likely to continue to suffer irreparable harm because "injury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages." *Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. Civ. A. 06-567, 2006 U.S. Dist. LEXIS 34841, at *63 (E.D. Pa. May 31, 2006); *see also Hillard v. Medtronic, Inc*., 910 F. Supp. 173, 179 (M.D. Pa. 1995).

53.     Unless Defendants are enjoined from further unfair competition, PharMerica will be irreparably harmed by:

(a)     The loss of its goodwill;

(b)     Damage to its organizational stability;

(c)     Use and disclosure of PharMerica's valuable confidential and trade secret information which is solely the property of PharMerica;

(d)     The loss of confidence and trust of customers and loss of business reputation; and

(e)     Present economic loss, which is unascertainable at this time and future economic loss, which is presently incalculable.

54.     PharMerica has no adequate remedy at law for these injuries because their loss is impossible to quantify.

## E.     BALANCE OF THE HARMS FAVORS PHARMERICA

55.     One of the goals of a preliminary injunction is to maintain the status quo, defined as "the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (internal quotation and citation omitted). Thus, to return the parties to "the last peaceable, noncontested status," the Court must return the parties to the position they held before Gottlieb and Shimoda breached their employment agreements, Defendants began misappropriating PharMerica's trade secrets, Defendants tortiously interfered with PharMerica's contractual and business relationships, and Defendants engaged in unfair competition.

56.     Given the facts of this case, maintaining the status quo by enforcing the employment agreements, preventing the misappropriation of trade secrets, preventing the tortious interference of contractual and business relationships, and preventing unfair competition will not cause greater harm to Defendants than the denial of relief will cause to PharMerica.

## F.     PUBLIC INTEREST SUPPORTS PROVIDING RELIEF TO PHARMERICA

57.     The public interest supports enforcement of the valid confidentiality, non-competition, and non-solicitation provisions in Gottlieb's and Shimoda's employment agreements with PharMerica. *See Quaker Chemical Corporation v. Charles Varga*, 509 F. Supp. 2d 469, 481 (E.D. Pa. 2007) (noting that restrictive covenants serve an important business

interest in the economy); *National Business Services, Inc. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (finding the enforcement of the restrictive covenant was in the public interest).

58.     Further, the public interest is served by the preservation of the status quo, the ability for PharMerica to continue its valuable customer relationships, the safeguarding PharMerica's trade secret information, and the prevention of unethical conduct on the party of Gottlieb, Shimoda, Sturgeon, and ContinuaRX.

59.     Therefore, it is appropriate under these circumstances for this preliminary injunction to order based on the record evidence, particularly due to the irreparable harm that Gottlieb, Shimoda, Sturgeon, and ContinuaRX are conspiring to effectuate upon PharMerica and will inure to the benefit of the public to uphold the parties' agreement and prevent unlawful activity.

Respectfully submitted,


*s/ George B. Musekamp*
David J. Porter (PA Bar #66125)
Tiffany A. Jenca (PA Bar # 319526)
Buchanan Ingersoll & Rooney PC
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA  15219
Phone: (412) 562-1318
Fax: (412) 562-1041
David.Porter@bipc.com
Tiffany.Jenca@bipc.com

Deborah. S. Brenneman (OH Bar # 0062113)
George B. Musekamp (OH Bar #0087060)
*Admitted PHV*
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio  45202
Telephone:  (513) 352-6700
Facsimile:  (513) 241-4771
Debbie.Brenneman@thompsonhine.com
George.Musekamp@thompsonhine.com

*Attorneys for Plaintiff PharMerica Corporation*